***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Chief Deputy Commissioner Gheen and the briefs and oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Chief Deputy Commissioner Gheen with minor modifications.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The plaintiff-employee was employed by defendant-employer, Norandal USA, Inc., from August 1, 1976 until December 1, 2004.
2. Global Indemnity, Royal and SunAlliance, Argonant Insurance Company, Argonant Midwest Insurance Company, National Union and Cigna/ACE USA/ESIS provided workers' compensation coverage during the plaintiff-employee's employment with the defendant-employers. For purposes of this claim, Cigna/ACE USA/ESIS shall be responsible for any workers' compensation benefits awarded to the plaintiff-employee as a result of his employment with the defendant-employer.
3. The parties are subject to the North Carolina Workers' Compensation Act, the defendant-employer employing the requisite number of employees to be bound under the provisions of said Act.
4. In addition, the parties stipulated into evidence the following:
 a. The Pre-Trial Agreement dated May 1, 2006.
 b. One volume of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 261514.
 c. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 078061. *Page 3 
 d. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 014133.
 e. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 226564.
 f. Two volumes of documents, which included Industrial Commission records, discovery responses, medical records and reports and personnel records, in IC 226563.
 g. Three volumes of documents, which included the transcript of proceedings in Daywalt v. Norandal USA and the stipulated exhibits from that case.
 h. Three volumes of documents, consisting of corporate records and an asbestos survey in IC 041133.
 i. Additional medical records relating to IC 226563.
 j. Additional medical records relating to IC 078061.
 k. Additional medical records relating to IC 226564
 l. Additional medical records relating to IC 014133
 m. Additional medical records relating to IC 261514.
5. The Pre-Trial Agreement dated May 1, 2006, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. Plaintiff, who is now sixty-five years old, began working for defendant-employer's predecessor on August 17, 1976. The plant in Salisbury where he worked produced aluminum foil of various thicknesses and widths, according to the specifications of its customers. Republic Foil built the facility in approximately 1965. The original plant had two foil separators, two slitters, one coil annealing furnace and six foil annealing furnaces. In subsequent years, one additional separator and another coil annealing furnace were added to the original building.
2. The plant was later purchased by National Aluminum, which expanded the facility in 1979 and 1980 to add a new building to which the casting operations were moved. During the expansion and the next six years, further equipment was added. By 1986 plant production was over 90 million pounds. Production increased further after another coil annealer was added. Norandal USA, Inc. then bought the facility in approximately 1989.
3. The process used by the plant involved melting raw aluminum, casting it into sheets, rolling sheets in mills until it achieved the desired thickness, cutting, or slitting the foil to the specified width and then winding it onto a core either as double or single sheets. In addition, the coils were heated to high temperatures in annealing furnaces at certain stages of the process in order to make the aluminum more flexible and strong and in order to remove oils and other residues.
4. When the original annealing furnaces were built, insulation containing asbestos was used in the walls, ceilings and floors. The wall insulation was sandwiched between an outer steel wall and an inner steel plate. When the furnaces were new, there was no asbestos insulation exposed along the walls and ceilings. *Page 5 
5. In a separate room within the original plant, employees machined sheets of Maranite, which looked like sheet rock but was much harder. The Maranite was used to make "tips" for the casting process. During the 1960s and 1970s, Maranite contained twenty-five to fifty percent asbestos. The employees in the Maranite shop drilled, sawed and sanded the Maranite sheets to achieve the desired shape for the tips. After the expansion in 1980, the process was moved to the new casting building. However, it appeared that the Maranite manufacturer stopped making the product in 1978, so it was not clear how much longer the plant used asbestos-containing Maranite to make tips. After the asbestos-containing Maranite was no longer available, the plant began using a ceramic material.
6. In 1972 plant management asked the State Board of Health to conduct an industrial hygiene survey of the Maranite shop. An industrial hygienist performed the survey and prepared a report in which he noted that the woodworking machines in the shop were equipped with hoods connected to an exhaust ventilation system, but that there was no means of dust control for hand-sanding. Air sampling conducted on employees working in the Maranite shop revealed levels of asbestos significantly above the permitted exposure limit, which at that time was well above the exposure limits later specified by OSHA. Consequently, the plant was advised to increase the volume of air drawn into the exhaust system.
7. In 1973 Z. L. Brown prepared a memorandum explaining to plant management how the OSHA standards for asbestos exposure were going to change and what procedures would be necessary for compliance. Some of the procedures he described were later implemented, but the vacuum system was not upgraded.
8. Subsequent industrial hygiene surveys did not result in any asbestos-related OSHA violations. However, in a report filed in 1985, insulation was noted to have fallen from the walls *Page 6 
of the annealing furnaces by NIOSH investigators. Testing revealed that the insulation contained five to eight percent asbestos. An industrial hygienist performed air sampling of the furnace crew and reported acceptable levels of asbestos exposure but noted that there was no recommended limit for exposure to bulk material and loose insulation containing asbestos. He expressed concern about the deteriorating insulation that was falling out of the furnaces, not only for the furnace crew but for other employees, as well, because convective air currents could carry asbestos fibers into the plant. He recommended a regular maintenance program for the furnaces as well as a monitoring program and advised the company to take corrective action by either sealing or removing the deteriorating insulation.
9. The industrial hygienist also noted that no clean-up activities were performed during his monitoring process and that it was more likely that employees would be exposed to short term high levels of asbestos rather than elevated full shift exposures. On the other hand, despite employee reports of seeing material being carried out of the furnaces on air currents, he did not observe that occurring.
10. Some air sampling was conducted in January 1987 during a cleaning process when scrap foil was being removed from one of the annealing furnaces. Although the sampling was not conducted for a long enough period to determine a proper time weighted average exposure, it showed the employee was exposed to 2.8 fibers per cubic centimeter of air during the time involved. Consequently, F. N. Bassinger suggested that protective clothing and respirators be provided to the employees performing that task until the problem was corrected. Despite that recommendation, the plant did not require employees to use protective clothing or respirators.
11. Further air sampling was conducted in November 1987 after regular cleaning of one of the furnaces and it revealed asbestos levels of 2.1 fibers per milliliter of air. This sampling *Page 7 
was also conducted for too short of a period to derive a proper time weighted average exposure. Elevated asbestos levels were also subsequently revealed by air sampling at one of the furnaces in 1990. The company then began the process of removing and replacing the insulation in the older annealing furnaces. It hired companies that specialized in asbestos abatement to perform the work, but the plant only had one furnace modified at a time because of the expense and the loss of productivity involved. The area was tented during the abatement process.
12. Laboratory testing of the insulation when the first furnace was abated in July or August 1990 revealed that there was block insulation containing fifteen to thirty percent asbestos and duct insulation containing thirty-five to fifty-five percent asbestos in the annealing furnace.
13. During the years of the abatement activities, there were several memoranda to plant management noting that the insulation in the annealing furnaces had deteriorated, that loose pieces were sometimes falling out and that there were loose protection panels in the walls and doors to the furnaces. The abatement process was completed in approximately 1998.
14. In about 1978 an explosion occurred in annealing furnace No. 21 which caused the door of the furnace, which weighed several tons, to fly forty to sixty feet into the plant, and which sent dust and debris throughout the plant. It took at least one month to clean up after the explosion.
15. Throughout the periods in question, the plant was ventilated by large overhead exhaust fans. There were also fans inside of the furnaces which distributed the heat. The heat and air movement inside the furnaces were part of the reason that insulation in the walls and doors would deteriorate and break off. The plant used a vacuum system to remove and capture scrap pieces of aluminum so that the aluminum scrap could be reprocessed. The vacuum system drew in dust and debris from the machines as well as the scrap aluminum. The aluminum pieces as well *Page 8 
as the dust and debris would go through a "cyclone" which separated the aluminum scraps, but the rest of the dust went through a wire mesh and exited inside the plant, not outside. Employees also used compressed air to clean their machines. Consequently, there were multiple ways that dust containing asbestos fibers would spread within the plant.
16. Plaintiff began working at the plant in August 1976 as a utility person in the separator/slitter department. In 1978 he was promoted to the position of separator/slitter operator "A", a job in the finishing department which involved setting up and operating coil sheet slitters, separators and trimming machines. These machines would unwind double sheets of aluminum coil stock, separate the sheets, trim the foil to the specified width and wind single sheets onto cores. At times, plaintiff might also be required to cut cores.
17. During the first nine or ten years of his employment, plaintiff worked primarily with the No. 2 machine. He then moved to the No. 1 machine. After the plant expanded, the No. 2 machine was located fifteen to twenty feet from furnace No. 22, but that furnace did not contain asbestos insulation. Slitter machine No. 1 was approximately sixty feet and therefore more distant from furnace. But it was located near the exhaust from the cyclone system.
18. The slitters were equipped with large brakes which would accumulate dust, and the operators had to clean off the dust when it built to a certain level. Although the exact periods were not disclosed by the evidence, for a good part of plaintiff's employment, the brake linings used in the slitters probably contained asbestos. At some point, however, the plant began using metallic brake linings. Until a better cooling system was developed for the machines, plaintiff would use compressed air once each shift to blow the dust off of the brakes.
19. In approximately 2003 plaintiff began working as a roller operator. He still held that position on the date of hearing before the Deputy Commissioner but was out on disability. *Page 9 
20. As of the date of hearing before the Deputy Commissioner, plaintiff had smoked approximately one pack of cigarettes per day for about 43 years.
21. As of at least February 1990, plaintiff received his regular medical care at Rowan Family Physicians, primarily by Dr. Diloreto. He was treated for multiple health problems over the years, including Meniere's disease, skin cancer, dizzy spells, possible transient ischemic attacks, chronic sinusitis, hypertension and diabetes. In September 1997 he had a chest x-ray reviewed by Dr. Grauel, who noted opacities in both middle to lower lungs with no pleural abnormalities. When he had his complete physical in September 1998, he reported having had past asbestos exposure and complained of occasional dyspnea on exertion. A chest x-ray taken that day was read as showing increased markings in his right mid lung and increased chronic markings in both lungs. Dr. Diloreto then referred him to Dr. Proctor, a local pulmonologist, who also saw bilateral increased interstitial markings. Pulmonary function tests performed at that time indicated a minimal obstructive ventilatory defect.
22. Plaintiff subsequently underwent a high resolution CT scan, which was reviewed by Dr. Johnson, a radiologist, on September 23, 1999. Dr. Johnson found some pleural parenchymal scarring but no definite interstitial abnormalities. There appeared to be one small, noncalcified pleural plaque in the left chest and some small areas of pleural thickening. Despite the lack of interstitial abnormalities, Dr. Proctor was of the opinion that plaintiff had asbestosis, in part because of plaintiff's description of significant exposure to asbestos dust in his employment.
23. Dr. Diloreto continued to follow plaintiff for his health problems. In 2000 and 2001 plaintiff did not report shortness of breath but in October 2002 he again complained of dyspnea on exertion. Pulmonary function testing revealed a significant response to a nebulizer, indicating an obstructive defect, so Dr. Diloreto advised him to stop smoking. In 2003 plaintiff *Page 10 
developed bronchitis, which the doctor considered to be an acute exacerbation of his chronic obstructive pulmonary disease. He also subsequently developed deep vein thrombosis and had to undergo anticoagulant therapy. A Dr. Breyer performed a "B-read" of a chest x-ray that year and noted small opacities with a 1/0 profusion.
24. By that time, plaintiff had filed this asbestos claim. Defendants had previously had chest x-rays and the 1999 CT scan reviewed by Dr. Goodman, a radiologist at Duke Medical Center, who had found no evidence of asbestosis or asbestos-related pleural disease. They then sent plaintiff to Dr. Spangenthal, a practicing pulmonologist in Charlotte, who examined him on February 5, 2004. Plaintiff advised the doctor that he had previously been diagnosed with asbestosis, that he had had shortness of breath since 1998, that he had a productive cough and that he got winded even when walking slowly. He had reduced the number of cigarettes he smoked per day but had not been able to quit smoking altogether. On examination, the doctor heard mild expiratory wheezes with a few scattered rhonchi but no rales. He reviewed the 1999 CT scan and x-ray and found no evidence of pleural plaques or asbestosis. Pulmonary function testing performed in his office revealed findings of obstructive lung disease with no evidence of restriction, which would be associated with asbestosis.
25. Dr. Spangethal was of the opinion that much of plaintiff's symptoms were due to chronic bronchitis and/or emphysema secondary to his smoking history, but he ordered a current high resolution CT scan to see if there was any evidence of asbestos-related disease. The test was performed February 13, 2004 and revealed no pleural or interstitial abnormalities according to the radiologist, Dr. Johnson. Since a high resolution CT scan was the best test, absent a pathological examination of lung tissue, Dr. Spangethal concluded that plaintiff had no evidence of asbestosis. Rather, he had obstructive lung disease due to cigarette abuse. *Page 11 
26. Plaintiff had another chest x-ray on March 3, 2004 which was read as showing no pleural abnormality and no acute or chronic abnormalities of the lungs.
27. On August 10, 2004 Dr. Bullard, a practicing pulmonologist in Concord, evaluated plaintiff at the request of his attorneys. The pulmonary function tests performed in Dr. Bullard's office were indicative of moderate obstructive lung disease, not restriction, but the doctor did not want to completely rule out the possibility of a restrictive component which could have been masked by air trapping due to emphysema. Nevertheless, he could not say that there was probably a restrictive component to plaintiff's breathing problem.
28. Plaintiff did not have as extensive an exposure to asbestos dust in his position with defendant-employer as the employees who regularly worked with the annealing furnaces. He was of the mistaken impression that furnace No. 22 was insulated with asbestos containing material. The history he gave to the doctors, insofar as his exposure to asbestos in the plant was concerned, was not accurate. Although he was exposed to asbestos fibers at work, his exposure was not to high levels of the fibers.
29. Pleural and interstitial changes caused by asbestos fibers do not improve or disappear with time. Consequently, if such changes are present, subsequent x-rays or CT scans should show them at least as well as earlier films. High resolution CT scans have been the best non-invasive means of identifying pleural and interstitial changes due to asbestos exposure. Neither of the high resolutions CT scans performed on plaintiff revealed any evidence of asbestos-related changes. Although there was evidence of pleural scarring and thickening at the upper levels of the lungs, those findings would be due to some other process not associated with exposure to asbestos fibers. *Page 12 
30. As of the date of this hearing before the Deputy Commissioner, plaintiff had not developed asbestosis. Although he was placed at an increased risk of developing asbestos-related pleural disease by virtue of his employment with defendant-employer, he did not prove that he developed any pleural disease which would be related to asbestos exposure. Consequently, he did not establish that he developed an occupational disease which was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer and which excluded all other disease to which the general public was equally exposed.
31. As a result of the Findings of Fact leading to the judgment in this case, it is not necessary to address Plaintiff's remaining issues.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. As of the date of hearing before the Deputy Commissioner, plaintiff had not developed asbestosis, the characteristic fibrotic condition of the lungs caused by inhalation of asbestos dust. N.C. Gen. Stat. §§ 97-53 (24); 97-62.
2. Plaintiff has also not proven that he developed an occupational disease of the pleura which was due to causes and conditions characteristic of and peculiar to his employment and which excludes all ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13); Booker v. Duke MedicalCenter, 297 N.C. 458 (1979).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following: *Page 13 
 AWARD
1. Plaintiff's claim for workers' compensation benefits is hereby DENIED.
2. Each side shall pay its own costs.
This ___ day of November 2008.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/___________________ BUCK LATTIMORE COMMISSIONER
 S/___________________ PAMELA T. YOUNG CHAIR *Page 1